UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PIETER HEYDENRYCH, individually and on behalf of all others similarly situated, | § § § | |
| | § | Civil Action No. 4:15-cv-1470 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| EAGLE ROCK ENERGY PARTNERS, L.P., EAGLE ROCK ENERGY GP, L.P., EAGLE ROCK ENERGY G&P, LLC, VANGUARD NATURAL RESOURCES, LLC, TALON MERGER SUB, LLC, JOSEPH A. MILLS, CHRISTOPHER D. RAY, WILLIAM K, WHITE, WILLIAM A. SMITH, HERBERT C. WILLIAMSON III, PEGGY A. HEEG, PHILIP B. SMITH, and DAVID W. HAYES, | § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

**AMENDED CLASS ACTION COMPLAINT
FOR BREACH OF FIDUCIARY DUTY AND
<u>VIOLATION OF FEDERAL SECURITIES LAWS</u>**

Plaintiff Pieter Heydenrych ("Plaintiff"), by his attorneys, alleges upon information and

belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of the public unitholders of Eagle Rock

Energy Partners, L.P. ("Eagle Rock" or the "Partnership") against the members of Eagle Rock

Energy G&P LLC's ("G&P") Board of Directors (the "Board" or the "Individual Defendants")

for their breaches of fiduciary duties arising out of their attempt to sell the Partnership to

Vanguard Natural Resources, LLC ("Vanguard") for inadequate consideration.  The Board

makes all determinations related to the conduct of the Partnership's business and operations.

Plaintiff also brings a claim individually against Defendants for their violations of Section 14(a)

of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2. On May 21, 2015, Vanguard and the Partnership announced a definitive agreement under which Vanguard, through its wholly owned subsidiary Talon Merger Sub, LLC ("Merger Sub"), will acquire all of the outstanding units of Eagle Rock for 0.185 Vanguard units per Eagle Rock unit (the "Proposed Transaction"). Based on the closing price of Vanguard's units on May 21, 2015, the implied per unit price that Eagle Rock unitholders will receive is $3.05. Inclusive of debt, the Proposed Transaction is valued at approximately $614 million and expected to close in the third quarter of 2015. The Board has breached its fiduciary duties by agreeing to the Proposed Transaction for inadequate consideration. As described in more detail below, the Partnership has undergone a transformational year that has positioned Eagle Rock for future success. Rather than allowing adequate time for the Partnership's transformation to take root, the Board has rushed into a sale and agreed to sell the Partnership for inadequate consideration.

3. The inadequate consideration the Partnership's unitholders will receive is not a surprise, considering the Board conducted a suspect sales process. Indeed, the deal was put together in roughly two months and the Board failed to contact any other potential purchasers or give adequate consideration to other indications of interest it previously received.

4. Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with unreasonable deal protection devices that serve to prevent other bidders from making a successful competing offer for the Partnership. Specifically, pursuant to the Agreement and Plan of Merger dated May 21, 2015 (the "Merger Agreement"), Defendants agreed to: (i) a strict no-solicitation provision that prohibits the Partnership from

soliciting other potential acquirers or from continuing ongoing discussions with potential acquirers; (ii) a provision that provides Vanguard with two business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Partnership to pay Vanguard a termination fee of $20 million in order to enter into a transaction with a superior bidder. Additionally, holders of approximately 39.5% of the Partnership's outstanding units have agreed to vote in favor of the Proposed Transaction and against any alternative proposal without regard to its terms. The voting agreement was only possible because Eagle Rock granted a limited waiver to a voting agreement it had with certain unitholders owning 39.5% of the units, which required the 39.5% unitholder to vote its shares in proportion with the public unitholders. These provisions unreasonably inhibit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Eagle Rock.

5. Vanguard filed a Form S-4 Registration Statement ("Registration Statement") with the U.S. Securities and Exchange Commission ("SEC"), dated June 15, 2015, which contains the joint proxy statement of Vanguard and Eagle Rock in support of the Proposed Transaction. The Registration Statement fails to provide the Partnership's unitholders with material information or provides them with materially misleading information, which precludes them from making an informed decision on whether to vote in favor of the Proposed Transaction.

6. The Individual Defendants have breached their fiduciary duties and G&P, Eagle GP (defined below), Vanguard, and Merger Sub have aided and abetted such breaches. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until Defendants cure their breaches of fiduciary duty.

**JURISDICTION AND VENUE**

7. The Court has personal jurisdiction over each of the Defendants because each is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

**PARTIES**

10. Plaintiff is, and has been at all relevant times, the owner of Eagle Rock common units. Plaintiff is a citizen of Canada.

11. Eagle Rock is a partnership organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 1415 Louisiana Street, Suite 2700, Houston, Texas, 77002.

12. Defendant Eagle Rock Energy GP, L.P. ("Eagle GP") is the Partnership's general partner and manages Eagle Rock's operations and activities. Eagle GP, and by extension Eagle Rock, is overseen by the board of directors of G&P.

13.    Defendant G&P is the general partner of Eagle GP and, by extension, manages Eagle Rock's operations and activities.

14.    Defendant Joseph A. Mills ("Mills") has been the CEO and Chairman of the Board since May 2007.  Additionally, since April 19, 2006, Defendant Mills has served as the CEO and a manager of Montierra Management LLC, which is the general partner of Montierra Minerals & Production, L.P. ("Montierra"). Natural Gas Partners VII, L.P. ("NGP VII") owns a majority of the limited partner interests in Montierra.  From March 2001 to August 2003, Mills was a Senior Vice President of El Paso Production Company, and from October 1999 to March 2001, he served as a Vice President of El Paso Production Company, a wholly owned subsidiary of El Paso Corporation.  Before his positions with El Paso related entities, Mills held various executive and senior management positions with Sonat Exploration Company, a wholly owned subsidiary of Sonat, Inc.  Defendant Mills is a citizen of Texas.

15.    Defendant Christopher D. Ray ("Ray") has been a G&P director since June 2011. NGP VII and Natural Gas Partners VIII, L.P., and certain other entities controlled by them (collectively, "NGP"), owns approximately 39.5% of the Partnership's outstanding units.  NGP has the right to appoint a maximum of three members to the Board, but one of those three seats is currently vacant.  Ray is one of NGP's two current appointees to the Board.  Ray is a Senior Managing Director and a member of the Executive Committee of NGP.  Defendant Ray is a citizen of Texas.

16.    Defendant William K. White ("White") has been a G&P director since October 2006.  Although White is not an NGP appointee to the Board, he has extensive connections with NGP and its related entities.  He has held various positions on the board of various NGP entities. From December 2012 to September 2014, White served as a director of NGP Capital Resource

Company, and from July through December 2008, he served as a director of CRC-Evans Internal, Inc., an affiliate of a portfolio company of NGP. Defendant White is a citizen of New Mexico.

17. Defendant William A. Smith ("W. Smith") has been a G&P director since September 2007. Defendants W. Smith, Mills, and Heeg (defined in paragraph 19 below) all have ties with El Paso Corporation and had overlapping tenures at the company and its related entities. From October 1999 to June 2002, W. Smith was an executive vice president of El Paso Corporation. From May 2008 to November 2014, W. Smith was a member of the board of directors of El Paso Pipeline GP Company, LLC, which is the general partner of El Paso Pipeline Partners, L.P. Prior to joining El Paso Corporation in 1999, W. Smith was executive vice president and general counsel of Sonat, Inc. Defendant Mills also worked for Sonat and its related entities. W. Smith and Mills worked for the company and its related entities at the same time. Defendant W. Smith is a citizen of Texas.

18. Defendant Herbert C. Williamson, III ("Williamson") has been a G&P director since July 2010. Defendant Williamson is a citizen of Texas.

19. Defendant Peggy A. Heeg ("Heeg") has been a G&P director since July 2010. Defendant Heeg held various positions with El Paso Corporation before 2004, including Executive Vice President and General Counsel from 2001 through 2003. Defendants Heeg, Mills, and W. Smith all were employed by El Paso Corporation and at least a portion of their tenures at El Paso related entities overlapped. Defendant Heeg is a citizen of Texas.

20. Defendant Philip B. Smith ("P. Smith") has been a G&P director since October 2006. Defendant P. Smith is a citizen of Oklahoma.

21. Defendant David W. Hayes ("Hayes") has been a G&P director since November 2011. Hayes is one of NGP's two current appointees to the Board. Hayes is a managing director of NGP and serves as NGP's director of Corporate Finance. Defendant Hayes is a citizen of Texas.

22. Defendants referenced in ¶¶ 14 through 21 are collectively referred to as the Individual Defendants and/or the Board.

23. Defendant Vanguard is a publicly traded, Delaware limited liability company with its headquarters located at 5847 San Felipe, Suite 3000, Houston, Texas, 77057. Vanguard acquires, produces, and develops oil and natural gas properties in various oil and natural gas reserves located in Wyoming, Arkansas, Oklahoma, Texas, New Mexico, Montana, Colorado, Louisiana, Mississippi, and North Dakota.

24. Defendant Merger Sub is a Delaware limited liability company wholly owned by Vanguard that was created for the purposes of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

25. By reason of the Individual Defendants' positions with the Partnership as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public unitholders of Eagle Rock and owe them, as well as the Partnership, a duty of care, loyalty, good faith, candor, and independence.

26. Under Delaware law, where the directors of a publicly traded partnership undertake a transaction that will result in either a change in corporate control or a breakup of the partnership's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the partnership's unitholders and, if such transaction will result in

7

a change of corporate control, the unitholders are entitled to receive a significant premium. To comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the Partnership's unitholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the partnership or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the partnership's unitholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public unitholders.

27.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the partnership; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public unitholders.

28.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to plaintiff and other public unitholders of Eagle Rock.

## CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and/or entities that owned Eagle Rock common units (the "Class") as of May 21, 2015, the date the Proposed Transaction was announced.  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

30.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Merger Agreement, as of the close of business on May 18, 2015, there were more than 152.9 million common units outstanding.  All members of the Class may be identified from records maintained by Eagle Rock or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

31.    Questions of law and fact are common to the Class, including, *inter alia*, the following:

> (i)    Have the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)    Have the Individual Defendants breached their fiduciary duty to unitholders by failing to seek the highest exchange rate possible for Plaintiff and other Class members' units;

(iii)    Have the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iv)    Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Partnership or its assets;

(v)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(vi)    Whether Defendants have violated the terms of the Second Amended and Restated Agreement of Limited Partnership, as amended by Amendment No. 1 (the "Partnership Agreement"), and its implied covenant of good faith and fair dealing;

(vii)    Have the Individual Defendants breached their fiduciary duties to unitholders by issuing a false and misleading registration statement with the SEC;

(viii)    Have Vanguard and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(ix)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

10

32.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

33.     Plaintiff will fairly and adequately protect the interests of the Class and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

### *Partnership Background and Its Poise for Growth*

35.     Eagle Rock is a growth-oriented upstream master limited partnership engaged in the exploitation, development, and production of oil and natural gas properties and the ancillary gathering, compressing, treating, processing, and marketing services with respect to its production of natural gas, natural gas liquids, condensate, and crude oil.  The Partnership has high working interest properties and development opportunities in four regions in the United States, including (i) Mid-Continent, which is comprised of areas in Oklahoma, Arkansas, and the Texas Panhandle; (ii) Southern Alabama; (iii) the Permian, which includes areas in West Texas; and (iv) East and South Texas, Mississippi, and Louisiana assets.

36.     The Partnership transitioned into a pure-play upstream master limited partnership by divesting its midstream business to Regency Energy Partners, L.P. ("Regency") for $1.325 billion.  That transaction closed on July 1, 2014.  In his annual letter to unitholders, Defendant Mills discussed the positive aspects of the divestiture and how the sale positioned the Partnership for future success. Mills wrote that the "completion and timing of the [m]idstream divestiture has

11

energized Eagle Rock into a partnership with a strong balance sheet and liquidity, upstream assets in key oil and gas basins in the United States, and a team in place to aggressively pursue accretive acquisition opportunities."

37.    Throughout the annual letter, Mills discussed that the Partnership sought to acquire new properties in an attempt to expand its business. Specifically, Mills explained that "Eagle Rock's healthy balance sheet and liquidity will enable us to expand our possibilities in 2015." He stated that Eagle Rock "intends to be opportunistic during this period of anticipated industry asset monetization activity in the second half of 2015" and the Partnership expected "many upstream companies will divest of non-core assets to reduce debt levels, improve liquidity, and fund drilling programs." As a result, the environment "could present an opportunity for Eagle Rock to acquire previously unavailable long-life, shallow decline producing assets that fit will in our MLP structure."

38.    The Partnership got off to a strong start in 2015 and emphasized that it was pursuing its stated goal of evaluating potential acquisitions. On April 29, 2015, the Partnership reported its financial results for the first quarter of 2015, for the period ended March 31, 2015. In the press release, Defendant Mills stated that "Eagle Rock had a strong first quarter" despite the "tumultuous commodity price environment." Looking forward, Mills stated that the "Partnership continues to remain very active in its business development efforts, evaluating more than $1 billion worth of MLP-appropriate asset acquisitions opportunities year to date." Mills added that although the Partnership was taking a "patient approach to acquisitions," it "expect[ed] to have an opportunity to utilize our liquidity to make a meaningful accretive acquisition in 2015 that will enable us to achieve greater scaled and diversity in our asset base while growing distributable cash flow."

12

39.     Despite the Partnership's stated intent to remain patient in evaluating acquisition opportunities and expectation that many entities would be selling non-core assets in the second half of 2015, the Board rushed into the Proposed Transaction and agreed to sell the Partnership for inadequate consideration.

*The Board Conducted an Inadequate Sales Process for the Partnership*

40.     The Board rushed into a sale of the Partnership with Vanguard without contacting other parties to gauge their interest in a potential business combination.  After Vanguard and the Partnership failed to reach a deal in 2014, the parties suspended negotiations between October 2014 and March 2015.  Within less than two months of Vanguard's renewed indication of interest, the Board rushed into a deal without contacting other potential purchasers and failed to give adequate consideration to indications of interest it received from other interested parties.

41.     In April 2013, the Board, with the assistance of Evercore and Citi, reviewed strategic alternatives and considered various strategic alternatives, including remaining a stand-alone entity, selling the entire Partnership, or selling Eagle Rock's upstream or midstream businesses.  The Board solicited interest from 18 potential counterparties and entered into confidentiality agreements with 17 parties.  It is unclear whether those confidentiality agreements included standstill provisions.

42.     In August 2013, five parties submitted indications of interest to purchase either the Partnership's upstream business or its midstream business.  None of the indications of interest were for the entire partnership.  Regency's $1.3 billion indication of interest was the highest offer for the Partnership's midstream business.  The Registration Statement does not indicate the highest indication of interest that the Partnership received for Eagle Rock's upstream business.

43.　　On December 23, 2013, the Partnership entered into a definitive contribution agreement with Regency.　Pursuant to the agreement, Eagle Rock contributed its midstream business to Regency for approximately $1.325 billion in cash, Regency common units, and the assumption of Eagle Rock debt.　After the transaction closed on July 1, 2014, Eagle Rock became a pure-play upstream MLP.

44.　　From July 1, 2014, through May 21, 2015, the day the Proposed Transaction was announced, the Partnership explored several strategic alternatives.　The Partnership considered acquiring other MLP-appropriate assets, finding a new sponsor with a large asset base of MLP-appropriate assets to be a strategic partner and support a growth strategy of "dropdown" assets, the sale of the Partnership, or potential strategic business combinations.

45.　　In May and June 2014, several parties expressed an interest in purchasing Eagle Rock or several of its assets.　In May 2014, Eagle Rock received an indication of interest from a private oil and natural gas partnership, identified as Company B, to acquire the Partnership for an undisclosed amount following the closing of the Regency contribution.　In June 2014, a multinational energy company, identified as Company C, inquired with the Partnership about acquiring several of its assets, but the parties did not reach a deal after conducting some due diligence.

46.　　Then, in July 2014, Eagle Rock initiated a "marketed process" and considered various strategic transactions with companies identified in the Registration Statement as Company D, Company E, Company F, and Company G.　With respect to Company G, the Partnership engaged in discussion about purchasing several of Company G's MLP-appropriate assets.　Discussions were put on hold in January 2015 but resumed in March 2015.　On May 13, 2015, negotiations ended for a second time after "it became clear that the parties' respective

positions on the value of the assets, as well as on proposed governance arrangements, were significantly apart."

47. On September 22, 2014, Vanguard contacted the Partnership to inquire about a potential merger, and the parties entered into a confidentiality agreement on October 6, 2014. On October 6, 2014, the Board's Conflicts Committee ("Conflicts Committee") met and reviewed the status of discussions and diligence with Vanguard. The Conflicts Committee discussed the "possible role" and its "related duties in connection with a transaction with Vanguard," although it is unclear whether there were specific issues requiring the Conflicts Committee's attention or anticipated conflicts that would need resolution. Several days later, on October 9, 2014, members of Vanguard's and Eagle Rock's management teams discussed "potential general and administrative expense synergies and financing synergies" that could be achieved from a combination.

48. Several weeks later, on October 24, 2014, Vanguard representatives informed Eagle Rock that it was not prepared to move forward with a transaction at that time. Negotiations would eventually resume between Vanguard and Eagle Rock in March 2015, but in the interim, Eagle Rock held negotiations with a number of parties regarding a potential business combination.

49. In March 2015, Vanguard representatives contacted Defendant Mills and indicated that Vanguard desired to resume merger negotiations. After several calls between Defendant Mills and Vanguard representatives regarding due diligence, on April 20, 2015, Vanguard informed Defendant Mills that it had purchased LRR Energy, L.P. ("LRR"). Over the next two weeks, Defendants provided Vanguard with various information and materials about the Partnership, including "employee matters."

15

50. It appears that the Board first heard about Vanguard's renewed interest in the Partnership at the April 21, 2015 meeting—roughly three weeks after Vanguard contacted Defendant Mills to express its renewed interest.

51. The Board reconvened on May 9, 2015, at which time the Partnership had received an indication of interest from Vanguard to purchase all outstanding Eagle Rock units for 0.175 Vanguard common units. Although the Partnership had received interest in potential transactions from other interested parties, in particular from Company G, Company L, and Company N, the Registration Statement is silent on the Board's views of each of those transactions. Furthermore, the Registration Statement indicates that as of May 9, 2015, the Board refused to contact additional parties to gauge their interest in a potential transaction. Instead, the Board merely reviewed the "marketing process undertaken in 2013" and without providing a reason, "not[ed] that the industry had active knowledge of Eagle Rock's continued interest in a combination transaction[.]" Furthermore, Evercore "reviewed a list of potential acquirers," but the Board did not authorize any outreach to these parties.

52. Without having even a basic understanding of what other potential purchasers would be willing to pay for the Partnership, the Board rushed into a deal with Vanguard for inadequate consideration.

***The Proposed Transaction Fails to Provide Unitholders With Adequate Value***

53. In a press release dated May 21, 2015, the Partnership announced that it had entered into the Merger Agreement with Vanguard pursuant to which Vanguard, through Merger Sub, will acquire all of the Partnership's outstanding units for 0.185 Vanguard common units per Partnership unit. The implied value of the consideration, based on Vanguard's closing stock price on May 21, 2015, is $3.05 per Eagle Rock unit.

54. Given the Partnership's recent transformation and the lack of time to fully implement its business plans, the consideration that unitholders will receive in the Proposed Transaction is inadequate and significantly undervalues the Partnership.

55. Eagle Rock units have been trading in excess of the implied offer price of $3.05 per unit. In fact, as recently as November 26, 2014, Eagle Rock's units closed at $3.14 per unit.

56. The Proposed Transaction consideration fails to adequately compensate Eagle Rock's unitholders for the significant benefits that Vanguard will receive in the Proposed Transaction. As discussed in Vanguard's May 26, 2015 acquisitions overview conference call, the Proposed Transaction is a strategic merger for Vanguard. Richard Robert ("Robert"), Vanguard's Executive Vice President and CFO, stated on the conference call that the Proposed Transaction "is another excellent strategic fit for Vanguard and will strengthen Vanguard's existing footprint in the Mid-Continent region in particular." Robert went on to say that certain of Eagle Rock's properties "overlay nicely with our existing assets. And with a high proved developed percentage of 78% and a proved reserve life of 12 years, they are highly complementary to our existing asset base."

57. Despite these significant benefits inherent in the transaction for Vanguard, however, the Board failed to secure a fair price for the Partnership, either for the intrinsic value of its assets or the value of the Partnership's assets to Vanguard.

58. Additionally, in the same conference call Robert indicated that certain Eagle Rock employees may be offered continued employment with the combined entity. Although Vanguard recently acquired LRR, it appears that Eagle Rock employees and not LRR employees will be offered positions in the combined entity. Robert stated on the conference call that "one very important benefit" of the Proposed Transaction was that it gave Vanguard "an opportunity to

attract and retain experienced oil and gas professionals from Eagle Rock.  The LRR acquisition did not come with any employees other than those out in the field.  So, this allows Vanguard to help fill the positions that would ultimately be needed after the LRR closing."

59.     Moreover, financial commentators have recognized that Eagle Rock units were greatly undervalued.  In a December 3, 2014 article titled "Eagle Rock: With a Yield Over 10%, This Well Hedged MLP Is Worth Much More Than $3" and published on the financial website SeekingAlpha.com, the author argued that the Partnership's units "appear[ed] undervalued and potentially due for a solid rebound."  Indeed, the author argued that Eagle Rock's units could be worth *up to $5 to $6 per unit*.  Specifically, the article stated:

> This stock looks deeply undervalued when you consider the yield and that book value is $4.87 per share. The consensus analyst price target for this stock is $5.75. Analysts at Standard & Poor's have set a $5 price target and they expect Eagle Rock to increase the distribution to 49 cents per share in 2015. Based on other yields in the MLP sector, that could provide enough yield to easily support a share price of $5 to $6. The current distribution of 7 cents per quarter or 28 cents on an annual basis, offers a yield of more than 10%. Just a few days ago this stock was trading at $3.28, but the recent hammering of the oil sector has created a true bargain in Eagle Rock shares. The pullback in this stock is not deserved because of its strong balance sheet, $100 million buyback, extensive hedging at high prices and because it has limited exposure to oil.

60.     Vanguard is seeking to acquire the Partnership at the most opportune time, at a time when the Partnership is well positioned for future growth.

### The Unreasonable Deal Protection Devices

61.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and unreasonable deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and potentially preclude competing offers will emerge for the Partnership.

18

62.    Section 7.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Partnership from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Vanguard.  Section 7.3(a) requires that the Partnership terminate any and all prior or ongoing discussions with other potential acquirers.

63.    Pursuant to Section 7.3(b) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Partnership must notify Vanguard of the bidder's identity and the terms of the bidder's offer.  Thereafter, Section 7.3(d) demands that should the Board determine to enter into a superior competing proposal, it must grant Vanguard two business days in which the Partnership must negotiate in good faith with Vanguard (if Vanguard so desires) and allow Vanguard to amend the terms of the Merger Agreement so that the competing proposal no longer constitutes a superior proposal.  In other words, the Merger Agreement gives Vanguard access to any rival bidder's information and allows Vanguard a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Vanguard and piggy-back upon the due diligence of the foreclosed second bidder.

64.    The Merger Agreement also provides that Eagle Rock must pay Vanguard a $20 million termination fee if the Partnership decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the unitholders with a superior offer.

65.    Moreover, in connection with the Proposed Transaction, Montierra Minerals & Production, L.P., Montierra Management LLC, Natural Gas Partners VII, L.P., Natural Gas Partners VIII, L.P. ("NGP VIII"), NGP Income Management L.L.C., Eagle Rock Holdings NGP 7, LLC, Eagle Rock Holdings NGP 8, LLC, ERH NGP 7 SPV, LLC, ERH NGP 8 SPV, LLC,

19

NGP Income Co-Investment Opportunities Fund II, L.P., NGP Energy Capital Management, L.L.C. (collectively, the "Holders"), who collectively own approximately 39.5% of Eagle Rock's common units, have entered into voting agreements to vote in favor of the Proposed Transaction with Vanguard and against any alternative proposal or any proposal made in opposition to the adoption of the Merger Agreement without regard to the terms of the alternative proposal.

66.    Importantly, the Holders' voting agreement with Vanguard was only possible because Eagle Rock granted the Holders a limited waiver of an existing voting agreement between the Partnership and Holders. As the Registration Statement explains, Eagle Rock agreed to waive a provision in its voting agreement with the Holders, which required the Holders to vote "in the same proportion as the public unitholders of Eagle Rock." In essence, this provision limited the Holders' ability to exert undue influence over Partnership votes by ensuring that the Holders' votes would mirror the public unitholders' votes. By waiving this provision, Eagle Rock allows the Holders to exert more influence over the vote on the Proposed Transaction than they would otherwise have, and in doing so, significantly reduces the power of the Partnership's public unitholders.

67.    Ultimately, these deal protection provisions unreasonably restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

*The Materially Misleading Registration Statement*

68.    The Registration Statement dated June 15, 2015, which Vanguard filed with the SEC, contained Eagle Rock's proxy statement.  The Registration Statement stated that the Partnership's Board unanimously adopted the Merger Agreement and recommended that public unitholders vote in favor of the Proposed Transaction.  The Registration Statement fails to provide the Partnership's unitholders with material information or provides them with materially misleading information critical to the total mix of information available to Eagle Rock unitholders concerning the financial and procedural fairness of the Proposed Transaction. Without such information, Eagle Rock unitholders cannot make a fully informed decision about whether to vote in favor of the Proposed Transaction.

**A.    The Registration Statement omits material information about management-prepared projections.**

69.    The Registration Statement fails to disclose material information about the projections that Eagle Rock's and Vanguard's management teams prepared.

70.    With respect to the projections that Vanguard's management team prepared, the Registration Statement should disclose: (i) the date that the projections were provided to Vanguard's board of directors and Wells Fargo; and (ii) the basis for the commodity pricing shown in the table on page 129 of the Registration Statement.

71.    For each of the tables from page 129 through 134, the Registration Statement should disclose: (i) both MMcfe/d and BOE/d for average daily production; (ii) unlevered free cash flows that are consistent with the definitions that Evercore and Wells Fargo used in their analyses; (iii) reconcile GAAP net income to non-GAAP unlevered free cash flows and non-GAAP EBITDA; (iv) stock-based compensation; (v) exploration costs; (vi) distributions; (vii) synergies; and (viii) all figures for the stub period of 2015.

72.    With respect to Eagle Rock management's projections for the Partnership, the Registration Statement should disclose: (i) the date that Eagle Rock's management-prepared projections were provided to the Board and Evercore; and (ii) the basis of the "oil and gas pricing assumptions of Eagle Rock." For Eagle Rock management's Case I projections, the Registration Statement should disclose (i) the basis for the correlation of NGL prices to crude oil prices; and (ii) explain the basis for the assumed reduction in Eagle Rock's borrowing base.

73.    With respect to Eagle Rock management's projections for Vanguard, the Registration Statement should disclose: (i) the date of the NYMEX strip; and (ii) show the pricing assumptions.

74.    With respect to Vanguard management's projections for Eagle Rock, the Registration Statement should disclose the "other assumptions" that were applied.

**B.    The Registration Statement omits material information about Evercore's and Wells Fargo's financial analyses.**

75.    The Registration Statement fails to disclose material data, inputs, and other information underlying the financial analyses supporting the fairness opinion of the Partnership's financial advisor, Evercore, including:

76.    The section of the Registration Statement with the heading "Opinion of the Financial Advisor to Eagle Rock" should disclose: (i) a valuation summary for each of Eagle Rock and Vanguard detailing the calculation of fully diluted shares; (ii) equity value, at the unaffected price and the offer price for Eagle Rock, and at the unaffected price for Vanguard; (iii) enterprise value, at the unaffected price and the offer price for Eagle Rock, and the unaffected price for Vanguard; and (iv) the pricing multiples, if calculated.

77.    With respect to Evercore's *Net Asset Value Analysis* for Eagle Rock, the Registration Statement should disclose: (i) a definition for future cash flows, including whether

22

they were levered for unlevered; (ii) identify, quantify, and source the discount rate assumptions used for each of the reserve category, hedging activities, and G&A expenses, and whether the figures reflect WACC or cost of equity; (iii) indicate the aggregate values of each of the components of the *Net Asset Value Analysis* and any additional calculations necessary to bring these aggregate amounts to the indicated per-share valuation range shown; (iv) indicate how terminal values were derived; (v) the projections corresponding to each of the three commodity price assumption cases, detailing each case according to the reserve categories Evercore used, hedging activities, and G&A expenses; and (vi) explain why commodity prices are not projected to grow with inflation after the end of the respective discrete projection period for each case.

78.     With respect to Evercore's *Discounted Cash Flow Analysis* for Eagle Rock, the Registration Statement should disclose: (i) the definition of cash flow as used in the analysis, including whether it is levered, unlevered, or the same definition that was used in the *Net Asset Value Analysis*; (ii) the reason the projection case used in the *Discounted Cash Flow Analysis* was different from all the projection cases used in the *Net Asset Value Analysis*; (iii) whether Evercore used the projections from Case I, Case II, or both; (iv) the range of perpetuity growth rates implied by the selected terminal EBITDA multiples; (v) the range of terminal EBITDA multiples implied by the selected perpetuity growth rates; (vi) identify and quantify the WACC assumptions; and (vii) a breakout of the indicated value ranges between the terminal multiple indications and the perpetuity growth indications.

79.     With respect to the *Discounted Distribution Analysis* for Eagle Rock, the Registration Statement should disclose: (i) the projected distributions; (ii) whether Evercore used the Case I projections, Case II projections, or both; (iii) the ranges of perpetuity growth rates and terminal EBITDA multiples implied by the selected terminal yields; (iv) identify and quantify

the cost-of-equity assumptions under (a) CAPM and (b) total expected market return methodology; and (v) explain the "total expected market return methodology."

80.    With respect to the *Peer Group Trading Analysis* for Eagle Rock, the Registration Statement should disclose: (i) the objective criteria used to select the nine comparable companies and partnerships; (ii) the observed company-by-company pricing multiples; (iii) the financial metrics that Evercore examined; and (iv) break out results by pricing multiples.

81.    With respect to the *Precedent M&A Transactions Analysis* for Eagle Rock, the Registration Statement should disclose: (i)  the objective criteria used to select the comparable precedent transactions; (ii) the observed transaction-by-transaction enterprise values, pricing multiples, and financial metrics; (iii) whether other pricing multiples were observed, and if so, disclose the observed multiples; (iv) the "other operating areas" that Evercore examined; (v) how the "similar asset profiles" were assessed; (vi) whether the multiples were applied by property, in the aggregate, or using another method; and (vii) identify and provide the multiples for the "four transactions involving partnerships and companies" that were announced "between March 2011 and April 2015" that Evercore reviewed; and (viii) break out the results by pricing multiple.

82.    With respect to the *MLP Premiums Paid Analysis* for Eagle Rock, the Registration Statement should disclose (i) the observed premiums and not just the premiums that Evercore selected; and (ii) why different transactions were deemed appropriate for this analysis than the *Precedent M&A Transaction Analysis*.

83.    With respect to the section with the subheading "Valuation of Vanguard," the Registration Statement should disclose: (i) who directed that Vanguard projections be adjusted; (ii) who made the adjustments to the Vanguard projections; (iii) quantify and provide the basis

24

for the adjustments; (iv) provide the basis for the assumptions related to changes in the revolver balance and the reserve-based credit facility.

84.    With respect to Evercore's *Net Asset Value Analysis* for Vanguard, the Registration Statement should disclose: (i) why cash flows from non-proved reserves were included in some instances but excluded in others; (ii) explain why commodity prices are not projected to grow with inflation after the end of the respective discrete projection period for each case; (iii) disclose the projections corresponding to each of the three commodity price assumption cases, detailing each case according to the reserve categories, hedging activities, and G&A expenses; (iv) identify, quantify, and source the assumptions used for each reserve category, hedging activities, and G&A expenses, and whether these figures reflect WACC or cost of equity; (v) indicate the aggregate values of each of the components of the *Net Asset Value Analysis*, (e.g., reserves, hedging), and any additional calculations necessary to bring these aggregate amounts to the indicated per-share valuation range shown; and (vi) indicate how Evercore derive the terminal values in its *Net Asset Value Analysis* for Vanguard.

85.    With respect to Evercore's *Discounted Cash Flow Analysis* for Vanguard, the Registration Statement should disclose: (i) why the projection case used here was different from all the projection cases used in the *Net Asset Value Analysis*; (ii) whether Evercore used the Case I projections, the Case II projections, or both; (iii) the range of perpetuity growth rates implied by the selected terminal EBITDA multiples; (iv) indicate the range of terminal EBITDA multiples implied by the selected perpetuity growth rates; (v) identify, quantify, and source the WACC assumptions; and (vi) show a break out of the individual value ranges between the terminal multiple indications and the perpetuity growth indications.

86. With respect to Evercore's *Discounted Distribution Analysis* for Vanguard, the Registration Statement should disclose: (i) the projected distributions; (ii) whether Evercore used the Case I projections, the Case II projections, or both; (iii) the ranges of perpetuity growth rates and terminal EBITDA multiples implied by the selected terminal yields; and (iv) identify, quantify, and source the cost-of-equity assumptions under both CAPM and the total expected market return methodology.

87. With respect to Evercore's *Peer Group Trading Analysis* for Vanguard, the Registration Statement should disclose: (i) the objective criteria used to select the comparable companies; (ii) the observed company-by-company pricing multiples and financial metrics that Evercore examined; and (iii) break out results by pricing multiple.

88. With respect to Evercore's *Precedent M&A Transaction Analysis* for Vanguard, the Registration Statement should disclose: (i) the objective criteria used to select the precedent transactions; (ii) the observed transaction-by-transaction enterprise values, pricing multiples, and financial metrics; (iii) whether other transaction multiples were examined, and if so, disclose the other examined multiples; (iv) what "other operating areas" were examined; (v) how "similar asset profiles" were assessed; (vi) whether the multiples were applied by property, in the aggregate, or using another method; (vii) break out the results by pricing multiple; and (viii) identify and provide the multiples for the "four transactions involving partnerships and companies" that were announced "between March 2011 and April 2015" that Evercore reviewed.

89. With respect to Evercore's *Relative Contribution Analysis* for Vanguard, the Registration Statement should disclose Energy Rock's and Vanguard's contributions by metric.

90.     The Registration Statement fails to disclose material data, inputs, and other information underlying the financial analyses supporting the fairness opinion of Vanguard's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo"), including:

91.     The section of the Registration Statement with the heading "Opinion of the Financial Advisor to Vanguard" should disclose: (i) a valuation summary for each of Eagle Rock and Vanguard detailing the calculation of fully diluted shares; (ii) equity value at the unaffected price and the offer price for Eagle Rock, and the unaffected price for Vanguard; (iii) the enterprise value at the unaffected price and the offer price for Eagle Rock, and the unaffected price for Vanguard; and (iv) the pricing multiples, if calculated.

92.     With respect to Wells Fargo's *Selected Companies Analysis*, the Registration Statement should disclose: (i) the objective criteria used to select the comparable companies; (ii) the observed company-by-company pricing multiples; (iii) the financial metrics that Wells Fargo examined; and (iv) the projection case that was used for this analysis, and why.

93.     With respect to Wells Fargo's *Selected Transactions Analysis*, the Registration Statement should disclose: (i) the objective selection criteria used to select the comparable transactions; (ii) the observed transaction-by-transaction enterprise values, pricing multiples, and financial metrics, and the other observed multiples (if any were examined); and (iii) the projection case that was used for this analysis, and an explanation why.

94.     With respect to Wells Fargo's *Discounted Cash Flow Analysis*, the Registration Statement should disclose: (i) the definition for free cash flows, including whether they were levered or unlevered; (ii) whether the terminal multiples were applied on a forward or trailing basis, and if the former then information should be provided for the 2020 EBITDA; (iii) the range of perpetuity growth rates implied by the selected terminal EBITDA  multiples; (iv) the

range of terminal EBITDA multiples implied by the selected perpetuity growth rates; (v) identify, quantify, and source the discount rate assumptions; (vi) whether the discount rates reflect WACC or cost of equity; (vii) whether the use of NYMEX strip pricing indicates that the projections used in this analysis differ from the projections used in Wells Fargo's other pricing analyses; (viii) specify the beginning and ending dates of the projection period that Wells Fargo used in its analysis; (ix) indicate whether a stub period was used for 2015; and (x) whether the projections included years past 2019.

### C.     The Registration Statement omits material information about the negotiations and process leading to the Merger Agreement.

95.     The Registration Statement states that in the summer of 2013, the Partnership "authorized a third-party solicitation" where it contacted a "total of 18 potential counterparties and enter[ed] into confidentiality agreements with all but one."  The Registration Statement should disclose whether any of the confidentiality agreements that seventeen parties entered into contained standstill provisions.

96.     The Registration Statement states that between August 14, 2013, and August 19, 2013, Eagle Rock received "indications of interest from five potential counterparties."  Of these five indications of interest, none were for "an acquisition of the entire partnership," two were for the upstream business, and three were for the midstream business.  Regency submitted the highest indication of interest for Eagle Rock's midstream business at $1.3 billion.  The Registration Statement should disclose the highest indication of interest for the upstream business.

97.     The Registration Statement states that in April 2013, the Board and Eagle Rock management were receiving the "assistance of Evercore and Citigroup Global Markets Inc. ('Citi')." The Registration Statement should disclose: (i) when the Board stopped receiving

28

assistance from Citi; and (ii) whether Citi advised the Board in connection with the sale of the upstream business and the Partnership's consideration of strategic alternatives since Eagle Rock entered into a definitive contribution agreement with Regency for the sale of its midstream business on December 23, 2013.

98.    The Registration Statement states that in May 2014, the Partnership received "an unsolicited non-binding indication of interest from a private oil and natural gas partnership ('Company B'), to acquire Eagle Rock for cash following the closing of the Regency contribution." The Registration Statement fails to disclose the key terms of Company B's indication of interest, including the price.

99.    The Registration Statement states that in late September 2014, Eagle Rock contacted Company G to discuss a strategic relationship. It continues to state that at a May 13, 2015 meeting between representatives of Company G and the Partnership, "it became clear that the parties' respective positions on the value of the assets, as well as on proposed governance arrangements, were significantly apart." The Registration Statement should disclose (i) the respective values that each party gave to the assets; (ii) the "governance arrangements" that were being discussed and the parties' positions on such arrangements; (iii) whether employment or leadership was being discussed, including who was leading discussions and the members of Energy Rock's management (if any) that were discussing continuing employment.

100.    The Registration Statement states that on October 6, 2014, the Board's Conflicts Committee held a telephonic meeting and discussed the "the possible role of the Eagle Rock Conflicts Committee and its related duties in connection with a transaction with Vanguard." The Registration Statement should disclose: (i) whether the Conflicts Committee meeting was held in the normal course or was a specially called meeting; (ii) who initiated the meeting; (iii) what the

29

Board discussed with respect to its "possible role" in connection with a transaction with Vanguard; and (iv) whether the Board previously discussed a "possible role" for the Conflicts Committee to play in connection with a transaction with Vanguard, and if it was discussed, when and why the Board had the discussion.

101.    The Registration Statement states that at the May 9, 2015 telephonic Board meeting, Defendant "Mills and Evercore next updated the Eagle Rock Board on the status of the alternative transactions discussed at the April 21, 2015 meeting (including, in particular, the discussions with Company G, Company L, and Company N)."  The Registration Statement should disclose (i) what the Board said at the April 21, 2015 Board meeting about the status of the alternative transaction discussions, in particular with respect to Company G, Company L, and Company N; (ii) what Defendant Mills and Evercore said at the May 9, 2015 meeting about the status of alternative transaction discussions, in particular with respect to Company G, Company L, and Company N, since the April 21, 2015 Board meeting; and (iii) what the Board said at the May 9, 2015 meeting about regarding alternative transactions, in particular with respect to Company G, Company L, and Company N.

102.    At the May 9, 2015 telephonic Board meeting, the Registration Statement states that "Mills and Evercore walked through each potential transaction, discussing the likelihood of execution, the current state of evaluation of each option, as well as the timeline related to each potential option."  The Registration Statement should disclose (i) "each potential transaction" that was discussed, including the key terms, such as price and parties involved; (ii) the "state of evaluation of each option" and what the Board said with respect to each option; and (iii) the "timeline related to each potential option."

30

103.  Additionally, at the May 9, 2015 telephonic Board meeting, the Registration Statement states that the Partnership's "management and Evercore reviewed with the Eagle Rock Board the marketing process undertaken in 2013, as well as more recent discussions with potential acquirers (including Company B and Company H), noting that the industry had active knowledge of Eagle Rock's continued interest in a combination transaction and that the additional marketing would therefore not likely result in potential acquirers contacting Eagle Rock." Evercore then "reviewed a list of potential acquirers of Eagle Rock (including Company H), noting whether each had already considered Eagle Rock and noting for each potential acquirer its financial or strategic ability to pursue a possible transaction." The Registration Statement should disclose (i) the recent discussions with potential acquirers (including Company B and Company H); (ii) the key terms, including price, of recent discussions the Partnership had with potential acquirers; (iii) the basis for the industry's "active knowledge" of Eagle Rock's continued interest in a potential business combination; (iv) the number of potential acquirers that Evercore identified, and indicate whether they were strategic or financial purchasers; (v) of the potential acquirers that Evercore identified, identify the number that "already considered" Eagle Rock; (vi) for each potential acquirer that Evercore identified, indicate its financial or strategic ability to pursue a possible transaction with the Partnership; and (vii) indicate whether any of the potential acquirers that Evercore identified were subject to standstill provisions.

104.  The Registration Statement states that the "Eagle Rock Board instructed management to work with Evercore to provide the Eagle Rock Board additional information regarding the net asset value of Eagle Rock, as well as a cost-of-capital analysis for Eagle Rock[.]" The Registration Statement should disclose: (i) whether Evercore conducted a cost-of-capital analysis for the Partnership; (ii) if Evercore conducted a cost-of-capital analysis for the

31

Partnership, whether the Board instructed Evercore to conduct a cost-of-capital analysis or Evercore determined to conduct the analysis without instruction from the Board; and (iii) if Evercore conducted a cost-of-capital analysis, indicate whether the Board considered the analysis; and (iv) include a summary of the analysis.

105.   The Registration Statement states that at the May 20, 2015 telephonic Board meeting, Evercore provided the Board with an "in-depth analysis of the proposed transaction and the methodologies undertaken by Evercore[.]"  The Registration Statement should disclose whether Evercore presented the Board with a cost-of-capital analysis at the May 20, 2015 telephonic Board meeting.

106.   The Registration Statement states that "Vanguard expects to be able to attract and retain experienced personnel from Eagle Rock to expand Vanguard's existing employee base and efficiently operate the combined business."  The Registration Statement should disclose (i) which members of Eagle Rock's management Vanguard expects to retain; (ii) whether Vanguard and members of management have engaged in discussions regarding future employment; (iii) identify the members of Eagle Rock management that have had discussions with Vanguard regarding future employment; and (iv) disclose whether, and if so, when, such discussions were disclosed to the Board.

107.   The Registration Statement should disclose the amount of fees that Evercore received from Vanguard in the previous two years.

108.   Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Partnership unitholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against all Individual Defendants)

109. Plaintiff repeats all previous allegations as if set forth in full herein.

110. The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the unitholders of Eagle Rock and have acted to put their personal interests ahead of the interests of Eagle Rock unitholders.

111. The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Partnership where unitholders will hold only a fraction of the acquirer, Vanguard, and is therefore a final stage transaction which imposes heightened fiduciary responsibilities to maximize Eagle Rock's value for the benefit of the unitholders and requires enhanced scrutiny by the Court.

112. The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the unitholders of Eagle Rock because, among other reasons:

(a)     they failed to take steps to seek the highest exchange rate possible for Eagle Rock and its public unitholders and took steps to avoid competitive bidding;

(b)     they failed to properly value Eagle Rock; and

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

113. As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Eagle Rock's assets and will be prevented from benefiting from a value-maximizing transaction.

114.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

115.    Plaintiff and the Class have no adequate remedy at law.

## COUNT II
### Aiding and Abetting
### (Against Eagle GP, G&P, Vanguard, and Merger Sub)

116.    Plaintiff repeats all previous allegations as if set forth in full herein.

117.    As alleged in more detail above, Defendants Vanguard and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

118.    As a result, Plaintiff and the Class members are being harmed.

119.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Individual Defendants)

120.    Plaintiff repeats all previous allegations as if set forth in full herein.

121.    The Partnership Agreement is a valid and binding contract between Plaintiff and other members of the Class on one hand and the Defendants on the other.  An implied covenant of good faith and fair dealing arises from this contract.  In addition to the express terms of this contract, the implied covenants of good faith and fair dealing obligates the Individual Defendants to deal honestly, fairly, and equitably with Plaintiff and the Class.

122.    The Individual Defendants breached the implied covenant of good faith and fair dealing by engaging in the misconduct described above.

123.    As a result, Plaintiff and the Class members are being harmed.

124.    Plaintiff and the Class have no adequate remedy at law.

34

## COUNT IV
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### Brought Individually

125. Plaintiff repeats all previous allegations as if set forth in full herein, excluding the class action allegations in ¶¶ 29-34.

126. Defendants have issued the Registration Statement, which includes the joint proxy statement of Eagle Rock and Vanguard, with the intention of soliciting unitholder support of the Proposed Transaction.

127. Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

128. Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9, because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

129. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

130. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)    enjoining, preliminarily and permanently, the Proposed Transaction;

(C)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)    directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)    granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

DATED:  July 6, 2015.

Respectfully submitted,

_/s/ Thomas E. Bilek_
Thomas E. Bilek
TX Bar 02313525 / SDTX Bar 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Counsel for Plaintiff*

**OF COUNSEL:**

Shane T. Rowley
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, NY  10004
Tel: (212) 363-7500